IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTT FETZER COMPANY, | ) | Case No. 1:16-cv-1570 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

This Report & Recommendation addresses the motions (EFC Docs. 18, 19) of The Scott

Fetzer Company for partial summary judgment on its First Claim for Declaratory Judgment and

Breach of Contract (ECF Doc. 1-1) and Zurich American Insurance Company's motions for

summary judgment (ECF Docs. 16, 17) on all claims.  Also pending, and necessarily disposed of

if the Court adopts the recommendations below, is The Scott Fetzer Company's Motion to Lift

Stay of Bad Faith Claim (ECF Doc. 32).  Because the underlying-suit sexual harassment and

assaults constituted three occurrences under the applicable insurance policy language, I

recommend that Zurich American Insurance Company's motion for summary judgment be

**GRANTED** and that The Scott Fetzer Company's motion for partial summary judgment be

**DENIED**.  Should the Court adopt those recommendations, I further recommend that The Scott

Fetzer Company's motion to lift stay be **DENIED** on the ground that it is moot.

The distressing allegations underlying this insurance coverage dispute arise from the actions of The Scott Fetzer Company ("Fetzer"), which, among other things, failed adequately to supervise an employee who was a convicted sex offender and who harassed and assaulted three of his female co-workers on numerous sales trips to sell vacuum cleaners door-to-door for Fetzer's Kirby vacuum subsidiary. Fetzer settled a Missouri state court lawsuit filed by the three victims. Fetzer made a claim for insurance coverage with its insurance carrier, defendant Zurich American Insurance Company ("Zurich"). Zurich agreed that there was coverage, but the parties have been unable to agree on the proper allocation of loss among them. More specifically, they disagree as to whether the claims in the underlying lawsuit represented one or multiple "occurrences" under the insurance policies. The parties have both moved for summary judgment. This case is before the undersigned by referral for a report and recommendation on those motions. ECF Doc. 31.

## II.     Factual History

### A.     Insurance Policies

Scott Fetzer Company operates and does business as The Kirby Company ("Kirby"), manufacturing vacuum systems for home use. ECF Doc. 14-C, Page ID# 599. Kirby sells vacuums through a network of independent distributors, which in turn retain independent dealers to sell vacuums door-to-door. Id. at 602.

Fetzer is an insured under two Zurich policies of general liability insurance. Zurich issued the first policy, number GLO 8979229-09, for the period January 1, 2012, to January 1, 2013. ECF Doc. 14-1, Exhibit A. Zurich issued the second policy, number GLO 8979229-10, for the period January 1, 2013, through January 1, 2014. ECF Doc. 14-1, Exhibit B. (Referred to collectively as "the Policies."). All material terms of the Policies are identical.

The Policies provide that Zurich "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which th[e] insurance applies." ECF Doc. 14-1, Page ID# 417; ECF Doc. 14-2, Page ID# 523. Section III of the Policies, regarding the limits of insurance, states:

> The Limits of Insurance show in the Schedule of this endorsement and the rules below determine the most [Zurich] will pay regardless of the number of:
>
> a. Insureds;
> b. Claims made or "suits" brought; or
> c. Persons or organizations making claims or bringing "suits". [*sic*]

ECF Doc. 14-1, Page ID# 414; ECF Doc. 14-2, Page ID# 519.

## B. The Underlying Missouri Lawsuit

In 2015, three females - Kristl Thompson, Ashley Raby, and Corbie Leslie (collectively, the "Missouri plaintiffs") - filed a Fifth Amended Petition for Damages ("the Petition") in a Missouri state court alleging that they had been sexually harassed and assaulted by a co-worker named John Daniel Fields while selling Kirby vacuums door-to-door for Fetzer.[1] ECF Doc. 14-3, Page ID# 599-668. The Missouri plaintiffs asserted numerous causes of action against Fields.[2] Id. at 617-31, 644-55. They also alleged the following claims against Fetzer and the other defendants (collectively, the "Kirby defendants."):[3] (1) fraudulent misrepresentation, (2) fraudulent concealment, and (3) negligence. Id. at 617-643.

---

[1] Among other business lines, Fetzer operates and does business as The Kirby Company manufacturing vacuum systems for home use. ECF Doc. No. 19, Page ID# 863. The Kirby vacuums are sold exclusively door-to-door through a network of independent distributors and dealers. Id.

[2] The claims against Fields include claims for assault and battery, intentional infliction of emotional distress, false imprisonment, fraudulent misrepresentation, and fraudulent concealment against Fields. Id. at 301-315, 327-339.

[3] The Petition collectively refers to several the defendants—The Scott Fetzer Company, Steven Crantz, Julie Crantz and Crantz Development LLC— as the "Kirby Defendants," alleging that Fields was one of their agents after February 2012. Doc. 14-3, Page ID# 601. The Petitioner also refers to The Scott Fetzer Company as either "Scott Fetzer" or "Kirby." Id. at 599.

The Petition alleged that Fields had a lengthy work history with Fetzer beginning in the 1970's and had become "one of the best sales persons in [Fetzer's] Kirby[] marketing plan." Id. at 603. The Petition also outlined Fields' lengthy criminal history. Id. at 603-06. Fields had a conviction for misdemeanor assault on a female. Id. at 603. He served one year in jail for a domestic battery and ten years in prison for forcible rape. Id. at 604-06. The Petition also averred that Fields raped his seventh wife on three occasions between 1999 and 2000. Id. at 604.

The Petition also alleged that Fetzer knew or should have known of Fields' criminal history. Id. at 604-606. The Petition states that Fetzer conducted a limited background check on Fields when he applied to become a Distributory Trainee with Fetzer. Id. at 604. Fields allegedly "served over a year in jail while he was a member of the Kirby Sales Team." Id. at 605. The Petition also alleged that Fetzer approved Fields to hold certain sales positions, even though Fetzer knew Fields had lied about his criminal record on his job applications. Id. at 604-05. Fetzer allegedly terminated Fields while he awaited trial in the forcible rape case because it learned that he had defrauded Kirby's elderly customers. Id. at 605. Upon Fields' release from prison in 2012, Fields again sold vacuums for Fetzer. Id. at 606. However, due to Fields' sex offender conviction, Fetzer required him to have a "chaperone" with him on sales calls in residential areas. Id. The Petition alleges that Fetzer appointed an employee to serve as Fields' sex offender chaperone. Id.

The Petition further alleged that all three Missouri plaintiffs sold vacuums for Fields and the Kirby Defendants. Id. at 607-11. Raby sold vacuums with Fields from May 2012 through August 2012. Id. at 607. During that time, Raby contended that she was "repeatedly sexually molested, harassed, assaulted, [and] abused…" by Fields. Id at 607-08. Similarly, Thompson declared that Fields inappropriately touched and fondled her on several sales trips throughout

September and October 2012. Id. at 608-09. Thompson also alleged that Fields forcibly raped her on a sales trip. Id at 609. Finally, Leslie asserted that she began working with Fields in January 2013. Id. at 609-10. Leslie likewise contended that Fields sexually assaulted her while on multiple sales trips. Id. The Petition further alleged that the Kirby defendants failed to inform the plaintiffs about Fields' criminal history and proclivity to commit sex crimes. Id. at 607-10, ¶46, 60, 70.

All the incidents involving Fields and the three Missouri plaintiffs alleged in the Fifth Amended Petition were asserted to have occurred at different times and different locations. ECF Doc. 14-1, PageID# 384.

### C.    Claims Against Fetzer

The Missouri plaintiffs asserted three claims against the Kirby defendants:   (1) fraudulent misrepresentation, (2) fraudulent concealment, and (3) negligence. Id. at 617-43. The fraudulent misrepresentation claims asserted vicarious liability for Fields' false promises in inducing the Missouri Plaintiffs to work with him. Id. at 617-23. The fraudulent concealment claims asserted theories of direct and vicarious liability. Id. at 623-31. As to direct liability, the Missouri Plaintiffs alleged that the Kirby defendants failed to inform them of "Field's criminal history, his sexually deviant propensities, his sexually deviant activities with other Kirby employees, and that he was forbidden from selling vacuums door-to-door without supervision because he was a sex offender." Id. at ¶¶ 136, 152, 168. The Missouri Plaintiffs also alleged that the Kirby defendants were vicariously liable for various misrepresentations Fields made to the Missouri Plaintiffs in the scope of Field's employment with the Kirby Defendants. Id. at ¶¶ 103, 114, 125. The Missouri Plaintiffs' negligence claims asserted that Fetzer negligently hired,

retained, and supervised Fields.[4]  Id. at 634-43.  Each plaintiff also claimed that the injuries alleged in the Petition were the "direct and proximate result" of the Kirby defendants' negligent acts and omissions.  Id.

### D.     Settlement of the Missouri Lawsuit

In February 2016, Fetzer agreed to settle all claims asserted in the Missouri lawsuit. Other than the settlement amounts to be paid, the three settlement agreements, filed under seal, were basically the same.  ECF Doc. 13-4; 13-5; 13-6.

One settlement amount reached with one Missouri plaintiff reached or exceeded the deductible amount set forth in the Policies and Zurich paid a portion of that settlement.  ECF Doc. 17, Page ID# 761; ECF Doc. 19, Page ID# 860.  Zurich did not reimburse Fetzer for the amounts paid in settlement to the other two Missouri plaintiffs, because it applied new deductibles, treating each plaintiff's claim as a separate "occurrence."  ECF Doc. 19, Page ID# 860.

## III.    Procedural Background

On May 23, 2016, Fetzer sued Zurich in the Cuyahoga County Court of Common Pleas. ECF Doc. 1-1.  The complaint asserted two causes of action: (1) a claim for declaratory judgment and breach of contract; and (2) a bad faith claim. Id. at Page ID# 10-12.  On June 22, 2016, Zurich removed the action to this court and filed its answer. ECF Docs. 1, 4.

Zurich later filed a "Motion to Bifurcate and Stay Discovery as to the Second Claim of Plaintiff's Complaint."  ECF Doc. 5.  On August 12, 2016, the court granted the motion and ordered bifurcation and stay of discovery on Fetzer's bad faith claim.

---

[4] The plaintiffs also alleged that Fetzer failed to "take reasonable steps to stop Defendant Fields' inappropriate and violent sexual misconduct despite knowledge of the same."  See e.g. ECF Doc. No. 14-3, PageID# 634, ¶187(l).

Zurich filed a motion for summary judgment. ECF Doc. Nos. 16, 17. Fetzer also filed a motion for partial summary judgment. ECF Doc. Nos. 18, 19. The motions have been fully briefed and are ripe for determination. On January 19, 2017, the summary judgment motions were referred to me for preparation of a report and recommendation. ECF Doc. 29.

## IV.    Law and Analysis

### A.    Summary Judgment Standard

Summary judgment is appropriate where "cit[ations] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations…, admissions, interrogatory answers, or other materials" show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mutchler v. Dunlap Mem'l Hosp.,* 485 F.3d 854, 857 (6th Cir. 2007). The initial burden of showing the absence of any "genuine issue" belongs to the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be resolved by a jury" or other fact-finder at trial. *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

"The fact that both parties make motions for summary judgment . . . does not require the Court to rule that no fact issue exists." *Begnaud v. White,* 170 F.2d 323, 327 (6th Cir.1948) (cited with approval in *Cherokee Ins. Co. v. E.W. Blanch Co.,* 66 F.3d 117, 122 n. 4 (6th Cir.1995)). Instead, the court must analyze each motion on its own merits, viewing facts and inferences in the light most favorable to the non-movant. *Westfield Ins. Co. v. Tech Dry Inc.,* 336 F.3d 503, 506 (6th Cir .2003).

"Where, as here, the facts of the case are not in dispute, an insurance coverage action involves solely legal issues and therefore is ripe for adjudication on summary judgment." *See Big Lots Stores, Inc. v. Am. Guarantee & Liab. Ins. Co.*, 240 F. Supp. 3d 725, 730 (S.D. Ohio 2017).

**B.      There Were Three Separate Occurrences Under the Zurich Policies**

Both parties agree that this case presents a single issue – "how many occurrences, and therefore how many deductibles, were involved in the [Missouri] Lawsuit and the three settlements."  ECF Doc. 14, Page ID# 385, ¶12.

Fetzer contends that the Missouri lawsuit and settlements represent one "occurrence" – "the purported negligence of Scott Fetzer in connection with the hiring, retention, and supervision of Fields."  ECF Doc. 19, Page ID# 869-75.  Thus, Fetzer contends that it is only required to pay one deductible.

Zurich argues that the Missouri lawsuit involved multiple "occurrences" because the claims involved different persons, locations, situations, and even different policy years.  ECF Doc. 17, Page ID# 764-69.  Thus, it is Zurich's position that Fetzer was required to pay multiple deductibles.

The parities have stipulated that Ohio law governs this dispute.  ECF Doc. 14, Page ID# 385.  An insurance policy is a contract and is generally subject to the same rules of construction as other contracts.  *Nationwide Mut. Ins. Co. v. Marsh*, 15 Ohio St.3d 107, 109, 472 N.E.2d 1061, 1062 (1984).  The interpretation of insurance contracts is a matter of law to be construed in accordance with the same rules of construction as other written contracts.  *Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (1992); *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 167-168, 436 N.E.2d 1347, 1348-1349 (1982).  Words and

phrases are to be given their plain and ordinary meaning unless there is something in the contract that would indicate a contrary intention. *Olmstead v. Lumbermens Mut. Ins. Co.*, 22 Ohio St. 2d 212, 259 N.E.2d 123, 126 (1970). When the provisions of an insurance policy are clear and unambiguous, "the words and phrases used therein must be given their natural and commonly accepted meaning consistent with the intent of the parties." *Darno v. Westfield Ins. Co.,* 2015-Ohio-2619, ¶ 11, 34 N.E.3d 967, 970. However, where the provisions of an insurance contract are reasonably susceptible to more than one interpretation, they must be "strictly construed against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 35 Ohio St.3d 208, 519 N.E.2d 1380 (1988), paragraph one of the syllabus.

The number of "occurrences" under an insurance policy is determined based on the language of the policies at issue and the facts of the case at hand. *Westfield Ins. Co. v. Cont. Ins. Co.*, No. 1:13CV02367, 2015 WL 1549277, at *4 (N.D. Ohio Apr. 6, 2015) (citing *Luk Clutch Sys., LLC v. Century Indemnity Co.*, 805 F. Supp. 2d 370, 377 (N.D. Ohio 2011)). "Ohio, like the majority of states, applies the 'cause test' when determining the number of occurrences under an insurance policy." *Big Lots Stores, Inc.,* 240 F. Supp. 3d at 732. "Under the cause test, the number of occurrences is determined by reference to the cause or causes of the damage or injury, rather than by the number of individual claims." *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 2007-Ohio-5576, 175 Ohio App. 3d 266, 886 N.E.2d 876, 885. "Numerous courts have recognized that 'the calculation of the number of occurrences must focus on the underlying *circumstances* which resulted in the personal injury and claims for damage rather than each individual claimant's *injury*.'" *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 832 (N.D. Ohio 2006) (quoting *Owens-Ill., Inc. v. Aetna Cas. & Sur. Co.*, 597 F. Supp. 1515, 1525 (D.D.C.1984)) (emphasis in original); *see also Michigan Chem. Corp. v. Am. Home Assur.*

*Co.*, 728 F.2d 374, 379 (6th Cir. 1984) ("the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims") (applying Illinois law).

The term "occurrence" is generally defined in the Policies to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." ECF Doc. Nos. 14-1, Page ID# 430; 14-2, Page ID# 536. The Policies contain a deductible endorsement that requires Fetzer to pay a $1,000,000 deductible per "occurrence" for bodily injury liability. ECF Doc. Nos. 14-1, Page ID# 479; 14-2, Page ID# 588. The deductible endorsement defines "occurrence" as follows:

> For any coverage described in the Schedule to which the each "occurrence" basis applies, to all sums payable for other than "ALAE" as the result of an accident, including continuous or repeated exposure to substantially the same harmful conditions, "regardless of the number of persons or organizations who sustain damages or to whom sums are payable because of that "occurrence".

ECF Doc. Nos. 14-1, Page ID# 480; 14-2, Page ID# 590.

Neither party argues that the Policies definition or use of the word occurrence is ambiguous. Further, the Policies define "occurrence" as it is often defined in insurance policies, and courts have found this definition unambiguous. *See e.g. Westfield Ins. Co. v. Tech Dry, Inc.,* 336 F.3d 503, 507-08 (6th Cir. 2003); *Big Lots Stores, Inc.*, 240 F. Supp. 3d at 731.

### 1. What constitutes an "occurrence"

Although the term "occurrence" is not ambiguous, the parties disagree regarding which conduct constitutes the "occurrence" or "occurrences" at issue. Zurich argues that each assault by Fields against each Missouri Plaintiff was a separate occurrence. ECF. Doc. 17, Page ID# 762. Zurich asserts that the Policies provide coverage not for a single act of negligence, but rather for the bodily injuries resulting from that negligence. ECF Doc. 22, Page ID# 904-05.

Zurich argues that each victim's separate exposure to the results of Fetzer's alleged negligence should constitute a separate "occurrence" under the Policies. Id.

Fetzer argues that the relevant "occurrence" is "the purported negligence of Scott Fetzer in connection with the hiring, retention, and supervision of Fields," which exposed the Missouri Plaintiffs to the "harmful condition" of Fields and his "dangerous proclivities. ECF Doc. 19, Page ID# 869, 871. Fetzer asserts that because Fetzer is the named insured under the Policies, Fetzer's alleged negligence, rather than the intentional acts of Fields in assaulting and imprisoning the Missouri Plaintiffs, must constitute the "occurrence." Id. Fetzer notes that the Petition from the underlying Missouri lawsuit claimed that Fetzer's negligent acts and omissions were the direct and proximate cause of the Missouri Plaintiffs injuries and damages. Id. at 817; *see also* ECF Doc. 14-3, Page ID# 611, 635, 639, and 643.

This court finds Fetzer's argument to be more persuasive and better bolstered by precedent. Fetzer cites a line of cases in which courts have held that "[w]hen a liability insurance policy defines an 'occurrence' as an 'accident,' a negligent act committed by an insured that is predicated on the commission of an intentional tort by another person, e.g., negligent hiring or negligent supervision, qualifies as an 'occurrence.'" *Safeco Ins. Co. of Am. v. White*, 122 Ohio St.3d 562, 2009 Ohio 3718, 913 N.E.2d 426, 432; *see also Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503 (6th Cir. 2003) (applying Kentucky law); *U.S. Fid. & Guar. Co. v. Open Sesame Child Care Ctr.*, 819 F. Supp. 756, 760 (N.D. Ill. 1993) (applying Illinois law); *Doe v. Shaffer*, 2000-Ohio-186, 90 Ohio St. 3d 388, 738 N.E.2d 1243, 1248-49.

For example, in *Safeco Ins. Co. of Am. v. White*, a 17-year-old boy attacked and repeatedly stabbed a 13-year-old girl and the girl's family sued the boy's parents, the Whites, for negligent supervision, negligent entrustment, and negligent infliction of emotional distress. 913

N.E.2d at 428-29.  At the time of the attacks, the Whites had four insurance policies, including a homeowner's policy and an umbrella policy.  Id. at 429.  The homeowner's policy and umbrella policy both defined an "occurrence" as an "accident" that results in injury or property damage. Id. at 431.  The insurers refused to defend or indemnify the Whites in relation to claims arising out of their son's intentional act.  Id. at 429.  The Supreme Court of Ohio subsequently addressed the issue: "[w]hen an insurance policy defines an 'occurrence' as an 'accident' that results in bodily injury, does an 'occurrence' include injuries that result from an intentional act when the insured[s] seeking coverage are claimed to have been negligent in relation to that intentional act."  Id. at 428.  The court noted that in *Doe v. Shaffer*, the court "concluded that 'the intentions or expectations of the negligent insured must control the coverage determination, and not the intentions or expectations of the molester.'"  Id. at 432 (discussing *Doe v. Shaffer*, 738 N.E.2d 1243).  The court reasoned that from the Whites' son's perspective the act of injuring the 13-year-old girl was intentional, but from the Whites' perspective, it was accidental.  Id. at 431.  The court held that the injury at issue was accidental and constituted an "occurrence" as defined in the policies.  Id. at 432.

Similar to *Safeco Ins. Co. of Am. v. White*, the intentional torts that the Missouri Plaintiffs allege Fields committed against them resulted from Fetzer's negligence and were, therefore, accidental when considered from the viewpoint of the insured, Fetzer.  Consequently, this Court finds that the "occurrence" at issue under the Policies is the negligence of Fetzer alleged in the Petition in the underlying Missouri lawsuit.

The cases on which Zurich relies are distinguishable and do not mandate a different conclusion.  Zurich cites several product liability cases, in which the courts held that an intentional business decision, such as the decision to include asbestos in a company's products,

did not qualify as an occurrence, event, or accident under the particular insurance policy. *See e.g. Westfield Ins. v. Cont'l. Ins. Co.*, No. 1:13CV02367, 2015 WL 1549277, at *3-4 (N.D. Ohio Apr. 7, 2015) ("in the Policies, an 'occurrence' is specifically and solely defined as an 'accident'" and "the decision to launch a product, and the distribution of that product into the market, is an intentional act."). Many of these products liability cases also dealt with policies that contained markedly different definitions of the term "occurrence" from the way that term is defined in the Policies here. *See e.g. Babcock & Wilcox Co. v. Arkwright-Boston Mfg. Mut. Ins. Co.*, 53 F.3d 762, 765, 767 (6th Cir. 1995) ("the policy defines 'occurrence' as 'any happening or series of happenings, arising out of or due to one event taking place during the term of this contract.").

For example, in *Westfield Ins. v. Cont'l. Ins. Co.*, the insurance company argued that the asbestos claims arose out of a single occurrence, the decision to distribute asbestos-containing products. *Westfield Ins. v. Cont'l. Ins. Co.*, 2015 WL 1549277, at *3. The seller of the products argued that the asbestos claims arose from multiple occurrences, namely the bodily injury suffered as a result of each victim's exposure to harmful asbestos fibers contained in the seller's products. Id. The insurance policy defined an "occurrence" as an accident, including continuous or repeated exposure to conditions, which results in bodily injury." Id. at *4. The court noted that the single occurrence the insurer advocated – the distribution of asbestos-containing products – was an intentional act, not an accident as is required by the policy's definition of "occurrence." Id. The policy's definition also required that the "occurrence" specifically include exposure to dangerous conditions that lead to injury. Id. at *5.

Zurich also relies on *LuK Clutch Sys., LLC v. Century Indem. Co.*, another product liability case that involved asbestos-related bodily injury claims, where the insurance policy defined the term "occurrence" as

> "an accident, including continuous or repeated exposure to conditions, which happens during the policy period and which result in personal injury or property damage, neither expected nor intended from the standpoint of the insured."

805 F. Supp. 2d 370, 373 (N.D. Ohio 2011). The insurance provider argued that the occurrence in the case was the decision to use asbestos in the products. *LuK Clutch Sys., LLC*, 805 F. Supp. 2d at 378. The Court rejected this position noting that it was "difficult to characterize a decision to use asbestos in clutch facings as a condition to which the claimants were exposed." Id. at 378. The Court also found that the decision to use asbestos in products that LuK Clutch Systems made in the 1970s could not constitute an occurrence that happened during the 1985 or 1986 policy periods. Id.

Zurich also attempts to analogize the present dispute to cases such as *Norfolk & W. Ry. Co. v. Accident & Cas. Ins. Co. of Winterthur*, in which the court found that "[m]any different sounds damaged the hearing of many employees in many places over the course of many years, making th[e] case one in which multiple occurrences created multiple injuries." 41 F.3d 928, 937 (4th Cir. 1994). The railroad in *Norfolk & W. Ry. Co.*, argued that the occurrence at issue was "the railroad's alleged continuing negligence with respect to excessive noise in the workplace." Id. at 936. The court held that the "occurrence language" in the policies at issue was ambiguous, but found that the railroad's occurrence interpretation was still not plausible because it "allow[ed] the cause test to sweep too broadly and arriv[ed] at a result which defie[d] common sense." Id. at 937.

In *Babcock & Wilcox*, the insurance policy defined an occurrence as "any happening or series of happenings, arising out of or due to one event taking place during the term of this contract in respect to the Assured's operations." 53 F.3d at 765. The Court found that during the contract term there was no coverage triggering "event," because Babcock did not make a decision to use asbestos in its boilers during the policy term. Id. at 767. Moreover, the resolution of *Babcock & Wilcox* turned on a definition of "occurrence" different from the one in the Policies. *C.f. Babcock & Wilcox*, 53 F.3d at 767 (stating cases that "turned on a definition of 'occurrence' different from the one in the policy at issue" only "superficially appear[ed] to support [a party's] position").

Consequently, this Court finds that the "occurrences" at issue are the negligent acts of Fetzer, including its failure to inform each Missouri Plaintiff of material information, its policies regarding sexual harassment, its hiring and retention of Fields, and its supervision of Fields in his interactions with each Missouri Plaintiff.

## 2. The number of "occurrences"

Having identified the "occurrence" at issue, the court must now determine the number of occurrences under the Policies. Zurich argues that the Missouri lawsuit involved multiple "occurrences" because the claims involved different persons, locations, situations, and even different policy years. ECF Doc. 17, Page ID# 764-69. Zurich cites several product liability and asbestos-related injury cases to support its argument. *See e.g. Babcock & Wilcox*, 53 F.3d 762 (6th Cir. 1995); *Westfield Ins. Co. v. Cont'l Ins. Co.*, 2015 WL 1549277; *LuK Clutch Sys., LLC*, 805 F. Supp. 2d 370; and *Cincinnati Ins. Co. v. ACE INA Holdings, Inc.*, 2007-Ohio-5576, 175 Ohio App. 3d 266, 886 N.E.2d 876. .

Fetzer contends that the Missouri lawsuit and settlements represent a single "occurrence" of "purported negligence of Scott Fetzer in connection with the hiring, retention, and supervision of Fields." ECF Doc. 19, Page ID# 869-75. Fetzer urges the court to use the "causation" approach and to focus on the underlying circumstances which resulted in the Missouri plaintiffs'' claim for damages against Fetzer in order to determine the number of occurrences, rather than the number of persons injured. Id. at 871. Fetzer also argues that that the definition of "occurrence" included in the Policies' deductible endorsement "expressly contemplates that an accident resulting in multiple 'exposures' to multiple 'victims' will still constitute a single 'occurrence' for purposes of the policies' per occurrence deductible." ECF Doc. Nos. 24, Page ID# 919. Fetzer's argument focuses on the language in the endorsement that states "to all sums payable . . . as the result of an accident, including continuous or repeated exposure to substantially the same general harmful conditions, regardless of the number of persons or organizations who sustained damages or to whom sums are payable because of that 'occurrence.'" *See* ECF Doc. Nos. 14-1, Page ID# 480; 14-2, Page ID# 590. Fetzer asserts that although the injuries suffered by each Missouri Plaintiff may have occurred at different times and to varying degrees, all the injuries flowed from Fetzer's negligence in connection with the hiring and supervision of Fields. Id. at 874.

Although Fetzer's negligent acts were the "occurrences" at issue under the Policies, there is no single "occurrence" that was the proximate cause of all of the Missouri plaintiffs' injuries. For example, each Missouri plaintiff alleged as part of her fraudulent concealment and negligence claims that Fetzer failed to inform her of material information, such as Fields' criminal history and his "dangerous propensity to commit violent sex crimes." ECF Doc. 14-3, Page ID# 624, 627, 630, 634. Further, the Petition in the Missouri Lawsuit alleged Fetzer was

negligent in supervising Fields' conduct regarding each separate Missouri plaintiff. ECF Doc. 14-3, Page ID# 632-643. Unlike negligent hiring "which occurs only once per employee-employer pair," negligent supervision is not invariably one "occurrence." *See Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 104-05 (7th Cir. 1996).

In *Lee v. Interstate Fire & Cas. Co.*, the Seventh Circuit declined to hold that a Roman Catholic diocese's negligent supervision of a priest was one occurrence. Id. at 105. The court noted "the same *kind* of negligent act can occur several times with separate injuries, producing several occurrences." Id. at 104. It stated:

> The tort is poor supervision, not negligent hiring, which occurs only once per employee-employer pair. An employer may leave employees to their own devices, but even the decision not to supervise may be revisited now and again. If as in the *Portland* case a diocese receives multiple warnings about a priest's misconduct and ignores all of them, it would be appropriate to call those lapses multiple occurrences – for intervention after any one of them could have avoided some of the injury. But if instead the diocese receives no danger signals, and its negligence lies in failure to investigate on its own (if that is negligence at all), or if the diocese intervenes but takes action that in retrospect is inadequate, then the lapse looks more like a single occurrence under the policy's definition.

Id. at 104-05 (citing *Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 35 F.3d 1325 (9th Cir.1994)).

As discussed above, the Petition in the Missouri lawsuit alleged that Fetzer had multiple warnings and knew or should have known of Fields' criminal history. Id. at 604-606. The Petition even alleges that the defendants, including Fetzer, were aware of Fields' sex offender conviction and appointed an employee to serve as Fields' sex offender chaperone. Id. at 606. Moreover, as Zurich notes, because of Fetzer's negligence, the underlying claimants were assaulted under different circumstances, at different locations, at different times, and sometimes in different policy years. ECF Doc. Nos. 22, Page ID# 904-05; 14-3, Page ID# 384, ¶ 7. These

facts indicate that negligence of Fetzer with respect to each of the three Missouri plaintiffs constitutes a separate occurrence under the Policies.

Further, Zurich cites several persuasive sexual misconduct cases from non-Sixth Circuit jurisdictions that involved multiple victims. In those cases, the courts generally found that there was a separate occurrence for each victim who was sexually assaulted or molested. *See e.g. H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 150 F.3d 526 (5th Cir. 1998) (finding that an employee's sexual abuse of two children constituted two "occurrences" under the insurance policy) (applying Texas law); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 87 A.D.3d 1057, 930 N.Y.S.2d 215 (2011) (applying New York law). Although these courts reached a different conclusion with respect to what constituted the "occurrence" than I have recommended above, the analysis regarding the number of occurrences when there are multiple victims remains persuasive.

The cases Fetzer cites largely do not support its position that there has been a single "occurrence." Fetzer cites *Parker Hannifin Corp. v. Steadfast Ins. Co.* 445 F. Supp. 2d 827 (N.D. Ohio 2006) for the premise that under Ohio law the "manufacture of defective gaskets causing multiple losses constituted [a] single occurrence." ECF Doc. 19, Page ID# 872. However, this Court noted in *LuK Clutch Sys.* that in *Parker Hannifin*

> [t]he most glaring distinguishing fact is [] that even though there were numerous deliveries of defective gaskets, all of the deliveries were made to a single customer. Therefore, the single customer's damages arose out of continuous or repeated exposure to the same defective product at the same facility.

805 F. Supp. 2d at 380. Similarly, this Court found in *Libbey Inc. v. Factory Mut. Ins. Co.*, also cited by Fetzer,

> [a]gain, the defective product was delivered to and used by a single customer that, after continued and repeated exposure to the defective product, experienced damage as a result.

*LuK Clutch Sys.*, 805 F. Supp. 2d at 380 (discussing *Libbey Inc. v. Factory Mut. Ins. Co.*, 3:06 CV 2412, 2007 U.S. Dist. LEXIS 45160 (N.D. Ohio Oct. June 21, 2007)). Unlike *Parker Hannifin* and *Libbey*, the underlying Missouri lawsuit involved multiple victim plaintiffs who experienced continued and repeated exposure to Field's sexual harassment and assault and who were injured as a result of Fetzer's negligent acts and omissions.

Fetzer also cites this Court's decision in *Manor Care, Inc. v. First Specialty Ins. Corp.*, No. 03CV7186, 2006 WL 2010782 (N.D. Ohio July 17, 2006) for the proposition, "[If] there is but one proximate, uninterrupted and continuous cause, all injuries and damages are included within that single proximate cause." ECF Doc. 19, Page ID# 871-72. But the Court subsequently clarified its decision on whether there was one or multiple occurrences in that case. *See Manor Care, Inc. v. First Specialty Ins. Corp.*, No. 03CV7186, 2006 WL 2371999, at *2 (N.D. Ohio Aug. 14, 2006) ("To the extent I did not specifically reference United National's third claim, I rectify the oversight now: issues of fact remain with respect to whether the test plaintiffs' injuries were the result of a single, proximate cause or multiple ones.")

Fetzer also undermines its position by asserting that the present case is "directly analogous to the facts and issues in" *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Or.*, 747 F. Supp. 618 (D. Or. 1990), a decision the Ninth Circuit subsequently reversed and remanded. ECF Doc. 19; Page ID# 872; *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Or.*, 35 F.3d 1325 (9th Cir. 1994). In *Archdiocese of Portland*, the insurance policy defined the term "occurrence" as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property during the policy period." 35 F.3d at 1329. In the underlying action, a boy who alleged molestation by a priest on numerous occasions between 1974 and 1983 sued the

Archdiocese of Portland in Oregon.  Id. at 1327.  The parties settled the underlying action with

contributions from the Archdiocese, its primary insurer, Lloyd's of London, and its excess

insurer, Interstate Fire and Casualty Company.  Id. at 1326.  The excess insurer subsequently

sued, claiming that under Oregon law, each act of molestation was a separate occurrence or that

the series of molestations in each policy period constituted a separate occurrence.  Id. at 1327.

The district court, applying the cause test, held that the molestations of the boy from 1979-1983

constituted a single occurrence.  Id. at 1328.  However, the Ninth Circuit reversed the district

court's decision because the terms of the policy made clear that negligent supervision alone

would not trigger any obligation on the part of the insurers.  Id. at 1329.  The Ninth Circuit also

found that because the insurance policy's definition of "occurrence" included the clause

"occurring during the period of insurance," the boy's exposure to the negligently supervised

priest in each different policy period constituted a separate occurrence.  Id. at 1330.

 This court should reject Fetzer's position that there was a single occurrence of negligent

hiring, retention and supervision by Fetzer, and hold that the claims in the Petition in the

underlying Missouri lawsuit alleged three separate occurrences under the Policies.  Such a

conclusion would require Zurich's motion for summary judgment to be granted and Fetzer's

motion for summary judgment to be denied.

## V. Recommendations

 I recommend that The Scott Fetzer Company's motion for partial summary judgment on

its First Claim for Declaratory Judgment and Breach of Contract (EFC Docs. 18, 19) be

DENIED.  I further recommend that Zurich American Insurance Company's motion for

summary judgment (ECF Docs. 16, 17] be GRANTED on all claims.  The granting of summary

judgment to Zurich American Insurance Company on all claims would render moot the Motion

to Lift Stay of Bad Faith Claim (ECF Doc. 32) filed by The Scott Fetzer Company.  I

recommend the motion to lift stay be DENIED as moot.


Dated: November 16, 2017

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).